**AGRICO CHEMICAL COMPANY and Continental Insurance Company**

v.

**SS ATLANTIC FOREST, Lash Barge No. CG–063 and Eurogulf Lines, Inc., d/b/a Central Gulf Contramar Line.**

**Civ. A. No. 76–1088.**

United States District Court, E. D. Louisiana, Division 1.

Oct. 5, 1978.

R. A. Redwine, New Orleans, La., for plaintiffs.

Edward J. Koehl, Jr., New Orleans, La., for defendants.

JACK M. GORDON, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs, Agrico Chemical Company and Continental Insurance Company, (hereinafter referred to as "Plaintiff" or "Agrico"), seek to recover for cargo damage and cargo shortage as a result of a collision between the moored Lash Barge CG–063 and a three Lash Barge tow that was at-

tempting to navigate through a narrow opening between Pontoons 1 and 2 of the Waalhaven Fleeting Area in Rotterdam, Holland.

The initial issue on liability is whether the defendant, Eurogulf Lines, Inc. (hereinafter referred to as "Defendant" or "Central Gulf") can bring the conduct causing the damage to the cargo aboard Lash Barge CG–063 under one of the exemption clauses established in the Carriage of Goods by Sea Act (COGSA) 46 U.S.C. 1304(2)(a)–(q). Were the defendant to succeed in this effort, the burden would then shift to the plaintiff-shipper to show that the defendant-carrier failed to use due diligence in making the CG–063 seaworthy. Should the defendant fail to bring the damage-causing conduct within a COGSA exemption, then it seeks to limit its liability pursuant to 46 U.S.C. 181, et seq. A principal task in proving that it had no privity or knowledge of the damage-causing factor is to demonstrate that the CG–063 was seaworthy.

After hearing the testimony of the parties, examining the exhibits, pleadings and proposed findings of fact and conclusions of law, and post-trial memoranda submitted by counsel, this Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

(1) Plaintiff, Agrico Chemical Company, was and now is a corporation organized and existing under and by virtue of the laws of a state other than Louisiana.

(2) Plaintiff, Continental Insurance Company, was and now is a corporation organized and existing under and by virtue of the laws of a state other than Louisiana.

(3) Defendant, Eurogulf Lines, Inc., d/b/a Central Gulf Contramar Lines, was and now is a corporation organized and existing pursuant to the laws of a foreign country, doing business within this Court's jurisdiction through its agent, Central Gulf Steamship Corporation, and was at all pertinent times the operator of the SS ATLANTIC FOREST and LASH BARGE CG–063.

(4) A cargo shipment of 375.748 tons of urea[1] owned by Agrico Chemical Company and insured by Continental Insurance Company, was delivered to defendant in good order and condition at the Som Merwedehaven Dock at or near the port of Rotterdam on or about April 29, 1975. The cargo was loaded aboard defendant's Lash Barge No. CG–063, and Central Gulf then issued its bill of lading No. 001, dated May 12, 1975. Immediately after loading at the dock, Lash Barge CG–063 was towed to Pontoon 1 in the Waalhaven Fleet, located in Rotterdam Harbor. The towing of this Lash barge and others owned by the carrier Central Gulf was done by H. Zwaak Jr., N.V. pursuant to a towage agreement that provided Central Gulf with "servicing" (towage between the Lash vessel or mother vessel and the fleeting area) and "harbor" towage (towage within the Rotterdam Harbor limits).

(5) Bill of lading No. 001 was an optional mode bill of lading for Lash barge or general vessel granting to the carrier the right to decide on its own option which cargo would be shipped in Lash barges and which would be shipped in general ships.

(6) Under the optional mode bill of lading, carrier Central Gulf elected to carry the cargo of Agrico by Lash barge and the Lash or mother vessel SS ATLANTIC FOREST from Rotterdam to the port of New Orleans, Louisiana, on Voyage 46 West.

(7) The Lash system utilized by defendant Central Gulf is designed to operate in the following fashion: A Lash or mother vessel, the SS ATLANTIC FOREST, is so designed and equipped to lift on board and carry specifically-designed Lash barges such as CG–063, which are fully loaded with cargo. The barges are loaded at various points on inland rivers or other waterways which are generally inaccessible to deep-draft ocean vessels. The barges are then towed from the inland ports where they received the cargo to the deep-water ports where they rendezvous with the ocean vessel and are loaded aboard for the ocean

---

1. Urea is a water-soluble crystalline solid used in fertilizer preparations.

segment of the journey. At the deep-water port of destination, the barges are unloaded and towed to inland ports or places for discharge at the agreed destination.

(8) The Waalhaven Fleet is a holding point in Rotterdam Harbor where the Lash barges can be towed and then moored to await the arrival of the mother vessel. The Lash barges are moored in rows along both sides of three pontoons comprising the Fleeting area. On May 13, 1975, the SS ATLANTIC FOREST was anchored near the Waalhaven Fleet to load barges for Voyage 46 West. Lash Barge CG–063 was the fourth and southernmost barge moored immediately adjacent to the east side of pontoon No. 1.

(9) The Lash barges operated by defendant Central Gulf are uniform in size and design. They are approximately 61.5 feet in length, 31.5 feet in width, and 13 feet in depth. These barges have a double bottom which extends approximately 30 to 45 centimeters from the bottom of the vessel, but from the double bottom to the loaded waterline above, the barges have a single skin of ¼ inch steel.

(10) On May 13, 1975, the SS ATLANTIC FOREST was in the port of Rotterdam anchored near the Waalhaven Fleet for the purpose of loading Lash barges. On this same day, the NEPTUNUS 6, a Zwaak tug working under a towage contract with Central Gulf, was at the Waalhaven Fleet servicing (towing Lash barges between the Lash or mother vessel and the Fleeting Area) the SS ATLANTIC FOREST. In the afternoon of May 13, 1975, the NEPTUNUS 7, another Zwaak tug, was performing harbor towage under its towage contract with Central Gulf. It had been requested to tow three Lash barges from the Waalhaven Fleet to another dock in Rotterdam. The three barges had already been made up into a tow when the NEPTUNUS 7 arrived. The tow was so made that the starboard side of the second barge in the tow extended beyond the starboard side of the lead barge. As a result, the starboard bow corner of the second barge extended out beyond the starboard stern corner of the lead barge.

(11) While attempting to maneuver the three-barge tow between pontoons Nos. 1 and 2 of the Fleeting Area, the NEPTUNUS 7 had difficulty turning its tow towards its starboard in order to clear pontoons Nos. 1 and 2 and head toward its destination. In realizing the difficulty that the NEPTUNUS 7 was having, the NEPTUNUS 6 voluntarily assisted by pushing against the port side of the lead barge of the three-barge tow in an effort to swing the head of the tow around to starboard. By this action the NEPTUNUS 6 also intended to push against the barges moored on the east side of pontoon No. 1 in order to swing that pontoon to the west and give the tow more room for maneuvering.

(12) As the three-barge tow gained speed, the starboard bow corner of the second barge in the tow which protruded beyond the starboard stern corner of the lead barge, struck Lash Barge CG–063 just aft of its port bow corner. Unaware that the CG–063 had been holed below the loaded waterline, both tug captains continued with their work in the fleet area.

(13) At approximately 5:15 p. m. the Netherland Freight Agency, Central Gulf's agent, who operates the Waalhaven Fleeting Area, was notified that Lash Barge CG–063 was in the process of sinking.

(14) Within 30 minutes of being notified, Netherland Freight Agency arranged for Lash Barge CG–063 to be towed to the stern of the SS ATLANTIC FOREST for loading. Because the barge did not have sufficient buoyancy to withstand the weight of the vessel loading frame and could therefore not be loaded aboard the mother vessel, the loading operation was abandoned, and the barge was then beached at the nearest possible location.

(15) Two pump boats were then summoned and the barge was pumped out to the point where it had buoyancy enough to withstand the loading procedures of the SS ATLANTIC FOREST. The Lash barge was then taken to the mother vessel where it was successfully loaded on board.

(16) Temporary repairs were made to Lash Barge CG–063 to stop the loss of the liquified urea that was escaping from the hole in the barge. The SS ATLANTIC FOREST then completed its voyage uneventfully, and the cargo described in bill of lading No. 001 was delivered to the plaintiff Agrico Chemical Company at Burnside, Louisiana, in both a damaged and short condition. The cargo consisted only of approximately 100 of the 375 tons of urea and parts of the delivered urea were in a liquified and unusable state.

(17) As stipulated to by the parties, damage to the cargo of urea amounted to $88,203.27.

## DISCUSSION

Plaintiff Agrico Chemical Company and defendant Central Gulf were parties to an optional mode bill of lading which incorporated the provisions of the Carriage of Goods by Sea Act (COGSA). In cargo damage cases such as the present matter, the provisions of COGSA control the rights, obligations, and burden of proof for determining responsibility of the loss.

■ Under COGSA, the shipper need only show that cargo was loaded aboard the carrier's vessel in undamaged condition and discharged in short or damaged condition to establish a prima facie case. *Socony Mobil Oil Company v. Texas Coastal and International, Inc. et al.*, 559 F.2d 1008 (5th Cir. 1977).

■ The carrier then has the burden of demonstrating that it properly and carefully stowed, cared for, and discharged the cargo or if not, that the negligent conduct resulting in damage to the cargo was one of the uncontrollable causes of loss defined in COGSA, 46 U.S.C. 1304(2)(a) through (q). *Nichimen Company v. M.V. Farland*, 462 F.2d 319 (2d Cir. 1972).

■ If the carrier is successful in proving that neither it nor its agents were negligent in caring for, stowing, or discharging the cargo or that any negligent conduct comes under one of COGSA's exemption clauses in § 1304(2), then the burden shifts to the shipper to prove that the carrier failed to use due diligence to make the vessel seaworthy and that the unseaworthy condition was a cause of the cargo damage. *United States v. Lykes Bros. Steamship Company*, 511 F.2d 218 (5th Cir. 1975); *Director General of India Supply Mission v. S.S. Maru*, 459 F.2d 1370 (2d Cir. 1972).

■ Though a carrier fails to exonerate itself from liability imposed by COGSA, where lack of privity or knowledge of the negligent conduct or unseaworthy condition causing the cargo damage can be shown, then the carrier may seek to limit its liability to the value of the carrier's interest in the vessel or vessels by which it is fulfilling its carriage contract under the bill of lading and the freight pending on the vessel or vessels. 46 U.S.C. 183(a).

For the reasons which follow, the Court finds, as a matter of law, that defendant Central Gulf has failed to bring any of the conduct causing cargo damage under any of the excepted causes of COGSA, though able to demonstrate that Lash Barge CG–063 was seaworthy. However, Central Gulf as owner of the Lash Barge CG–063 and the mother vessel SS ATLANTIC FOREST, will be entitled to limit its liability to the value of Lash Barge CG–063, the other Lash barges consigned to the New Orleans voyage, the SS ATLANTIC FOREST and all pending freight for cargo aboard these vessels since the collision holing the Lash Barge CG–063 was caused by navigational errors which were outside the privity or knowledge of the vessel owner and no condition of unseaworthiness caused the cargo damage. Since the value of these vessels and their cargo should exceed the stipulated cargo damage, Central Gulf is unable to limit its liability beyond the stipulated amount.

## PRIMA FACIE CASE

■ Plaintiff Agrico Chemical Company has demonstrated that it was issued a clean bill of lading signifying that the cargo of urea was loaded while in good condition and that the cargo was delivered to its destina-

tion in a damaged condition and short. It has thus established a prima facie case in its action for damages against the cargo carrier Central Gulf.

## EXCEPTED CAUSES UNDER 46 U.S.C. 1304 2(a) through (q)

■ Once a prima facie case is made by the shipper, then the burden shifts to the carrier to show that there was no negligence in caring for the cargo, but if there were, that any act of negligence causing damage to the cargo comes within one of the exempted clauses set out in § 1304. Central Gulf concedes that negligent navigation of the three-barge tow caused the holing of CG–063 and damage to the cargo. It argues in the alternative that the negligent navigation of the three-barge tow was an "act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship" § 1304 2(a) or, if not, then "any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier . . ." § 1304 2(q). This Court will first examine the applicability of § 1304 2(a).

*Error in the Navigation or the Management of the Ship:*

Central Gulf argues that the carrier can take advantage of "the error in navigation or management of the ship" defense even though the actual negligence in navigation did not pertain to the carrying vessel specified in the bill of lading (CG–063), but rather to other barges owned by the carrier laden with goods belonging to other shippers and towed by an independent contractor not then responsible for fulfilling any of the carrier's duty under Agrico Chemical's bill of lading. Defendant sets forth two theories in support of its contention. First, the carrier analogizes its situation to the situation in those cases where courts have held that the tug and tow operating under a contract of transportation, even where owned by different parties, will be considered as one vessel in applying the error in navigation exemption. *Sacramento Navigation Company v. Salz*, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663 (1926). In effect, the courts have considered the entire tow which is necessary for carrying out the contract of transportation to be a single vessel in navigation when the navigational error occurred.

The cases cited by defendant do not stand for the proposition, however, that the tow can take advantage of the error in navigation exemption though it is not the laden vessel under the particular bill of lading in which COGSA was then being applied. Although Central Gulf can successfully argue that the entire three-barge tow should be considered as one vessel, though the tug was owned by a towing contractor, the carrier has not provided support for its contention that the carrier can take advantage of the error in navigation of any vessel owned by it as long as that vessel is the cause of the cargo damage at issue in the suit brought pursuant to COGSA.

Second, Central Gulf argues that a clause in the bill of lading setting out the beneficiaries to the exemptions and immunities under COGSA specifically confirms that the carrier and shipper fully intended to apply the error in navigation exemption to all towing vessels fulfilling any responsibilities of the carrier, whether pursuant to the actual bill of lading with Agrico or not. The bill of lading provides:

Because the carrier requires persons and companies to assist it in the performance of all work and services undertaken by it in connection with the cargo described herein as well as the cargo of others transported or to be transported by the carrier, it is expressly agreed between the parties hereto that the ocean vessel, or substitute, the tugs/pushers employed to tow/push the barge named herein and other barges, the owners, operators, charterers, master, officers and crew members of such ocean vessels and tugs/pushers and all stevedores, longshoremen, agents, representatives, employees or contractors and others used, engaged or employed by the carrier in the performance

of the work and services of the carrier, shall each be a beneficiary of this contract and shall be entitled to all exemptions and immunities from and limitations of liability which the carrier has under this bill of lading, whether written, printed or stamped hereon or incorporated by reference herein, and under the United States Carriage of Goods by Sea Act, 1936, and in entering into the provisions of this clause, the carrier, to the extent of such provisions, does so not only on its own behalf but also as agent and trustee of the ocean vessels, tugs/pushers, barges, each person and company described above, all of whom shall be deemed to be a party to the contract evidenced by this bill of lading.

Central Gulf suggests that the intentions of the parties to the bill of lading do not run afoul of the principles of COGSA since the above clause merely exonerates the carrier from liability for the negligence in navigation of those independent contractors which the carrier should not remain responsible for once it sought seaworthy tugs and competent crews.

■ In construing the exemptions under COGSA, this Court must construe them narrowly, since the purpose of the COGSA defenses was to give the carrier a narrowly defined protection from its own fault or that of its agents. *Zander & Company v. Mississippi Shipping Company,* 171 F.Supp. 184 (E.D.La.1959). With this caution in mind, this Court examines the theories put forth by Central Gulf to determine if the carrier can come within the error in navigation exemption. On careful examination of the entire Carriage of Goods by Sea Act, and in reading each statute in light of the others, this Court finds that it can clearly discern what Congress intended to accomplish in referring to "in the navigation or in the management of *the ship.*" (Emphasis added.)

■ In § 1303, Congress states that the carrier shall be bound to exercise due diligence to make *the ship* seaworthy, properly man, equip, and supply *the ship,* and make the holds . . . and all other parts of *the ship* . . . fit and safe for their reception, carriage, and preservation. (Emphasis added.) In § 1304, Congress states that neither the carrier nor *the ship* shall be liable for loss or damages arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make *the ship* seaworthy . . . . (Emphasis added.) Under § 1304(2), Congress states that neither the carrier nor *the ship* shall be responsible for loss or damages arising or resulting from . . . . (Emphasis added.) Finally, Congress refers in the error in navigation exemption to the act, neglect, or default of the master . . in the navigation or in the management of *the ship.* (§ 1304) (Emphasis added.) When considering these statutes together, it is all too obvious that Congress was referring to the same ship in the error in navigation clause as that ship which it required the carrier to exercise due diligence to make seaworthy, equip and supply, and make the holds fit and safe for carriage of goods. The carrier had to perform these duties on the ship designated in the bill of lading as the vessel to be laden with the cargo. Obviously it would not have been for the specific benefit and protection of the cargo owner if Congress required that any random ship owned by the carrier be made seaworthy. Congress never intended to let any vessel, as long as owned by the carrier and causing damage to the cargo, take advantage of the error in navigation clause.

■ The evidence in the record amply shows that the three-barge tow as navigated by NEPTUNUS 6 and NEPTUNUS 7 was in navigation but was not navigating the moored Lash Barge CG–063. Rather, the tow was simply attempting to navigate by the moored vessel when it struck the Lash barge with the bow of its second barge. Before the carrier can take advantage of the exemption for the error in navigation of the three-barge tow, the tow must be laden with the cargo that is the subject of the bill of lading with Agrico. The bill of lading states that Lash Barge CG–063 and the SS ATLANTIC FOREST would carry the cargo of urea.

Even when considering Central Gulf's contention that the bill of lading expressly allows every towing vessel in the service of the carrier to take advantage of all the exemptions and immunities which the carrier has under this bill of lading, the application of the negligence in navigation exemption is no different. Still, the ship that must err in navigation is that vessel that COGSA requires that the carrier use due diligence to make seaworthy.

It has been held that a Himalaya clause, which purports to extend to a carrier's agents and servants all defenses provided for the carrier, is valid. *Tessler Brothers (B.C.), Ltd. v. Italpacific Line,* 494 F.2d 438 (9th Cir. 1974). Courts have held that the Himalaya clause in the bill of lading must expressly state the intentions of the shipper and carrier. This requirement has developed out of the following understanding of COGSA's purpose.

> The Carriage of Goods by Sea Act represented a compromise between the interests of carriers and shippers. It was intended to increase the liability of carriers, and set a standard below which they could not go. . . . [*Leather's Best, Inc. v. SS Mormaclynx,* 313 F.Supp. 1373, 1381 (E.D.N.Y.1970)]

Even where Himalaya clauses are clearly drawn, courts will strictly construe those clauses purporting to limit the liability of the carrier. As stated in *Tessler Brothers (B.C.), Ltd., supra* :

> We recognize that the content of ocean bills of lading is for all practical purposes completely within the carrier's power, subject to the provisions of COGSA, and that contracts purporting to limit liability must be strictly construed. (494 F.2d at 445)

In following these guidelines and interpreting that clause in the bill of lading making all agents of the carrier the beneficiary of exceptions and exemptions provided the carrier under COGSA, this Court cannot conclude that the carrier and shipper fully intended to exempt the carrier from liability where a carrier-owned vessel, not laden with a cargo to be shipped under the particular bill of lading, damages that cargo through its error in navigation. Under the clause in the bill of lading, any of those parties defined as beneficiaries, can take advantage of the error in navigation exemption by establishing that the cargo of urea was damaged by an error in navigating CG–063.

Under the facts as established, the carrier cannot bring itself under the error in navigation exemption of § 1304 2(a) since it has failed to show an error in navigation of the laden vessel CG–063.

*Fault of the Carrier or its Agent, § 1304 2(q):*

Defendant Central Gulf next seeks to bring the alleged negligent conduct in navigating the three-barge tow into the moored Lash Barge CG–063 under § 1304 2(q) of Title 46. § 1304 2(q) reads:

> Neither the carrier nor the ship shall be responsible for loss or damages arising or resulting from any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contribute to the loss or damage.

Defendant contends that the towing company Zwaak, the owner of the tugs NEPTUNUS 6 and 7, was at fault for the negligent navigation of the three-barge tow that resulted in the damage to the cargo in issue. Central Gulf argues that Zwaak was operating as an independent contractor under a contract of towage with Central Gulf. Furthermore, if Lash Barge CG–063 was not being navigated, as urged by Agrico, then the defendant suggests that the Zwaak tugs were not performing services on behalf of the carrier in connection with its obligations under the particular bill of lading which is a contract between the parties. Thus Zwaak would not be an agent of the carrier under

the contract of carriage through which the rights and liabilities of COGSA are being applied.

■■■■■■ There is no indication in COGSA or in its legislative history that the term "agent" used in § 1304 2(q) should be construed in terms of the bill of lading such that only those third parties performing work under the bill of lading would be considered as agents. Section 1304 2(q) ("Q Clause") is a catchall exception [2] that allows the carrier to exonerate itself from liability by sustaining the burden of proving that it was in no way at fault in causing the loss of cargo at issue. In demonstrating this lack of fault, the carrier must also show that no party to whom it had delegated any of its responsibility to care for the cargo was at fault. The carrier has the non-delegable duty of properly and carefully loading, handling, stowing, carrying, keeping, caring for, and discharging the goods carried. § 1303(2). For that reason it may not insulate itself from liability by the use of independent contractors. For any failure by the independent contractor to care for the cargo is also a failure by the carrier to do the same. *Interstate Steel Corp. v. SS Crystal Gem*, 317 F.Supp. 112 (D.C.N.Y. 1970). A carrier is liable for any negligence of those parties in whose hands it has placed the goods, whether the parties are servants, agents, or independent contractors. *David Crystal, Inc. v. Cunard S.S. Company*, 339 F.2d 295, 298 (2d Cir. 1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1340, 14 L.Ed.2d 271 (1965).

Central Gulf elected to fulfill its obligation under the bill of lading by using the Lash barge system rather than a general vessel. Increased risks in caring for the cargo certainly arise since the carrier becomes responsible for towing the Lash barges to the fleeting area and to the mother vessel, for safeguarding the cargo while the barges are moored in the fleeting area, and for loading the barges and cargo aboard the mother vessel. The carrier cannot insulate itself from these increased risks incurred by choice by hiring third parties to

perform its responsibilities. Each third party assuming delegated responsibilities undertakes the over-all responsibility not to damage the cargo in the carrier's custody. Where, through some act of negligence by an independent contractor, the cargo is damaged, then the carrier is ultimately responsible for breaching its non-delegable duty to properly care for the cargo.

Central Gulf had delegated all its towage responsibilities to Zwaak Towing Company. Incumbent on Zwaak while performing under the contract of towage was the duty to safeguard the moored Lash barges at the fleeting area from damage by negligent towage. Inherent in that duty is the responsibility to protect and to safeguard the cargo contained within those moored Lash barges. The negligence of the NEPTUNUS 6 and NEPTUNUS 7 in failing to carry out this duty to safeguard Lash Barge CG–063 and its cargo is thus attributable to the carrier Central Gulf. *Levatino Company v. M/S Helvig Torm*, 295 F.Supp. 725 (S.D.N.Y.1968). Furthermore, and based on the carrier's non-delegable duty to properly care for and keep the goods in carriage, the carrier is responsible for the negligent actions of hired independent contractors who negligently damage that cargo.

■■■ Because the cargo at issue was damaged through the negligent navigation of a three-barge tow caused by a towing company hired by the carrier Central Gulf, Central Gulf cannot bring this conduct under the exemption in the "Q Clause". Zwaak Towing Company was an agent under the terms of the "Q Clause" such that Central Gulf was bound by its fault. While Central Gulf has used ingenuity in arguing that the "Q Clause" exemption should be expanded to meet the present fact situation, this Court must be ever mindful that the carrier's immunities under COGSA must be strictly and narrowly construed and not extended in doubtful and uncertain cases. *See*, Gilmore & Black, *The Law of Admiralty*, 2d Ed., § 3–29.

---

**2.** Phraseology used in Gilmore & Black, *The Law of Admiralty*, 2d Ed., § 3–37, p. 167.

LIMITATION OF LIABILITY

Since it has now been determined that the carrier Central Gulf cannot bring the "fault" causing the cargo damage under any excepted cause under COGSA, the next issue as urged by the carrier in the alternative is to determine whether Central Gulf, as owner of Lash Barge CG–063 and the SS ATLANTIC FOREST is entitled to limit its liability pursuant to 46 U.S.C. 181, et seq.

A determination of whether a shipowner is entitled to limit its liability is a two-step process. First, the Court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the Court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness. For it is only knowledge of those factors which are found to have actually caused the accident, and not just any negligent acts or unseaworthy conditions, which preclude a shipper's ability to limit. *Farrell Lines, Inc. v. Jones*, 530 F.2d 7 (5th Cir. 1976). In determining this issue, the carrier has the burden of proof in establishing a lack of privity or knowledge on its part.

The distinction between whether the cause of the cargo damage is a negligent act, navigational error, or an unseaworthy condition of the vessel is a critical one in resolving the limitation issue. If the cause of the collision is either a negligent act or a navigational error on the part of the crew of the vessel, then the shipowner is entitled to limit its liability. *Farrell Lines, Inc. v. Jones, supra.* But if the causative factor was an unseaworthy condition of the vessel, then the reasoning is that such condition could have been, and should have been, discovered before the vessel left the dock, and therefore knowledge of the unseaworthy condition is imputed to the shipowner through its managerial agents, port captains, or marine superintendents. *The Linseed King*, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932); *Coleman v. Jahncke, Inc.*, 341 F.2d 956 (5th Cir. 1965), rehearing denied 5 Cir., 348 F.2d 868, cert. denied 382 U.S. 974, 86 S.Ct. 538, 15 L.Ed.2d 465 (1966).

This Court has found that the cargo was damaged as a result of navigational error, and that the navigational error was committed by a towing company committed to towing responsibilities for the carrier. This Court must now hold that the carrier Central Gulf had no knowledge or privity of those acts of negligent navigation causing the accident and damage to cargo. Before Central Gulf is entitled to limit its liability, however, it must demonstrate that the cargo damage was not caused by an unseaworthy condition of the CG–063.

Agrico has urged several theories as to why the Lash Barge CG–063 is unseaworthy because of its design and construction. Contending that these Lash barges are frequently bumping one another as the tugs carry out their towing assignments, Agrico suggests that the single skin construction and thickness of the sides of these barges do not provide adequate protection from the routine contact of the barges. Plaintiff contends that a double skin construction could have withstood the collision between the three-barge tow and the CG–063, while the single skin frame was holed, resulting in loss to the cargo. Plaintiff argues further that the single skin construction especially renders a barge laden with soluble bulk cargo unseaworthy since a holing of the barge would necessarily bring the cargo in contact with the water, since there is no further protection of the cargo once the side is damaged.

Agrico offered the testimony of its expert, Arthur A. Grant, a mechanical engineer who operates an independent technical consulting firm specializing in design work, surveying, and appraising. When asked his opinion, Grant stated it was unlikely that a single skin Lash barge could withstand the ordinary wear and tear of the Lash barge trade. He additionally stated that the carriage of bulk soluable cargo in a single skin barge is particularly undesirable since the holing of the single skin will immediately endanger the cargo. Grant felt that the double skin design is primarily for damage control against holings such as that which

occurred to the CG–063. Grant stated that his firm had done some work on approximately ten to twelve Lash barges over the last eight years that had been damaged through the single skin shell plating.

Defendant Central Gulf suggests that there are some 2960 single skin Lash barges in operation today, with all these vessels having the highest classification which can be given to a river barge by the American Bureau of Shipping (ABS). Furthermore, Lash Barge CG–063 had undergone her special periodical survey in October of 1974, was retained in the same class by the ABS, and had continuously remained in that class up to the time of the casualty on May 15, 1975.

William W. Hamilton, an expert in the field of naval architecture and marine engineering, and an employee of the naval architecture firm Friede & Goldman, Inc., who introduced the Lash barge concept, testified on behalf of defendant that Lash Barge CG–063 was not only seaworthy for carrying bulk soluable cargo, but its design and construction actually exceeded the ABS requirements for barges of its size in both the thickness of its shell plating and the spacing of its internal framing. When asked about the purpose of double skin design, Hamilton stated that it was less for damage protection against holings from impact and more to maintain structural integrity of those barges that had been designed with wider hatch covers but less deck area. So as to regain strength from the loss of deck surface, the designers added an additional skin to the shell plating, Hamilton suggested. Considering the deck and hatch cover design of Lash Barge CG–063, Hamilton stated that the single skin thickness of the shell plating is most efficient to carry bulk soluble cargo under those conditions of river travel for which the vessel is certified.

Defendant suggests that this Court should give more weight to the opinion of Mr. Hamilton than that of Mr. Grant since Hamilton is a naval architect and marine engineer who specializes in the design and construction of the Lash barge. In contrasting Mr. Hamilton's knowledge and experience with Lash barges, Central Gulf avers that Grant is not a marine architect and has never made any calculations concerning the structural integrity or any other feature of the Lash barge.

Grant did not have any statistical data concerning the loss ratio of single skin Lash barges as compared to the loss ratio of double skin Lash barges or double skin hopper barges. Of the utmost significance and as suggested by defendant, Mr. Grant offered his opinion without having surveyed the damages to CG–063, or without having any idea about the circumstances under which the holing took place.

Though this Court certainly realizes that Hamilton has an indirect interest in this litigation, as a member of the naval architect firm that has designed and patented the single skin Lash barge, it must conclude that his vast experience and knowledge with Lash barges completely overshadows Grant's modest familiarity with the vessels. Certainly this Court would have given considerably more weight to Grant's opinion had he presented data or test results demonstrating the strength of single skin shell plating under specified conditions concerning force of impact. Additionally, had Grant been able to give details concerning the ten or twelve Lash barge holings examined, including facts concerning the navigating speed of each barge or responsible vessel when the holing occurred, then the Court could have attached more significance to this testimony.

■ On the record before this Court is the opinion of a naval architect who has designed and experimented with the very barges under consideration, the opinion of a design specialist who has done considerable work in design on other types of barges with different functions than those of the Lash barge, and finally, those facts relating to the holing of CG–063. As stated by Captain Alie Koops who was pushing the three-barge tow that collided with CG–063, his tow was gaining speed and the tug NEPTUNUS 6 was providing an additional push when the starboard bow corner of the second barge in the tow hit the moored

Lash barge. Koops stated that he felt the impact of that collision. This evidence confirms to the Court that the substantial force and speed of the tow was the true cause of the holing and not the fact that CG–063 only had a single shell plate. Though admittedly a double skin barge would provide more protection from impact, it is certainly not clear that it would have been effective protection from a blow of this nature and force. Circumstances surrounding the holing do not belie the testimony of Hamilton that a single skin barge is fully capable of taking the normal wear and tear of Lash barge activity. Considering that there are almost 3,000 single skin Lash barges in operation today, many of which are carrying bulk soluble cargo, it is inconceivable that on the basis of the record before it, this Court can conclude, as a matter of law, that those vessels are unseaworthy when carrying soluble cargo.

■■ To decide if a vessel is seaworthy, the Court must conclude that it is reasonably fit for its intended service. *California & Hawaii Sugar Refining Corporation, Ltd. v. Winco Tankers, Inc. et al.*, 278 F.Supp. 648 (E.D.La. 1968). This does not require that it be fit in the face of any blow no matter the force. The single skin design need not provide the best protection against holing as long as it provides reasonable protection.

Agrico further submits that the single skin design is even more unfit for Lash barge operation since any holing will certainly result in damage to soluble cargo since the single skin provides the only protection against water damage and any defect cannot be remedied quickly.

The weight of the evidence before this Court demonstrates that the single skin shell plating adequately protects the Lash barges' cargo during the normal course of activities in a fleeting area. A Lash barge is not rendered any less seaworthy because cargo will be damaged to some extent after the forceful impact resulting from a collision. Certainly there may be more effective designs in protecting cargo from water damage once a barge's side is holed. Yet the fact that a better design exists does not render the single skin concept defective. When considering the nature of Lash concept, the multiple purposes of the Lash barge as both a vessel and the container for cargo to be piggy-backed aboard, the single skin concept may well be the optimal design, suiting all purposes, while giving adequate protection from external blows. Based on the testimony of defendant's experts and the Court's knowledge of the collision at issue, this Court concludes that the single skin design is reasonably fit for Lash barge operation in spite of the immediate danger of harm to cargo once a holing occurs.

Even though the CG–063 is seaworthy in construction, Agrico still contends that the Lash barge was inadequately equipped and that defendant made no effort to maintain the devices and tools by which a hole could be quickly repaired so as to preserve cargo once a leak occurred. All parties agree that divers would be required to first find the hole and then to apply the temporary patch if the vessel is to be repaired while in the water. Where the hole is below the waterline, considerable time might elapse before discovery of the damage, as in the instant case. Under those circumstances faced by Central Gulf, the action they took in first trying to load the Lash barge aboard the mother vessel and then beaching it when loading could not be accomplished, was probably more effective than applying a temporary patch. First, loss of the entire cargo caused by the sinking of the Lash barge might most effectively have been prevented had the barge been successfully loaded aboard the mother vessel. Once loaded, a carrier could apply a more effective patch to the hole. Certainly, the procedure designed to immediately eliminate the risk of loss of the entire barge is more efficacious than the more time-consuming procedure proposed by plaintiff which runs the very risk of endangering the entire vessel with its cargo while attempting to minimize cargo loss. Second, assuming that the divers could apply a patch while the vessel was in the water, there still remains

the strong possibility that the barge would lose enough buoyancy to endanger it during the loading process. If so, then the barge would still have to beached and some water along with soluable cargo pumped out before the barge could be loaded aboard the mother vessel.

When considering the expense of maintaining such a diving service to apply patches when needed along with the possibility that the proposed technique might be even less effective than that approach used by defendant, the Court does not conclude that the failure to provide patches and divers rendered the Lash barge unseaworthy. The argument presupposes that the single skin design itself is unseaworthy such that the carrier would need to be on constant alert for a holing of one of its barges. This presupposition cannot be made, as previously stated by this Court. Again, Agrico with the benefit of hindsight is proposing a plan that possibly could have been a more successful salvage operation. This Court cannot rely on pure hindsight and suppositions in judging whether a vessel is reasonably equipped so as to be seaworthy. Defendant has proved by a preponderance of the evidence that Lash Barge CG–063 was seaworthy although designed with a single skin and not equipped with a temporary patch. Such proof entitles Central Gulf to limit its liability since it has demonstrated that it had no privity or knowledge of the negligence in navigation causing the cargo damage.

Though Central Gulf is entitled to limit its liability, a second crucial determination remains to be made; that is, what vessel or vessels and pending freight should be considered in determining the value that the carrier is not to exceed in paying the damages. Defendant Central Gulf suggests that only the value of Lash Barge CG–063 and its pending freight should be considered in setting the limitation of liability amount. As a counter argument, plaintiff Agrico asks that the Court limit the liability of defendant to the value of the mother vessel SS ATLANTIC FOREST, all Lash barges which were consigned to the particular voyage of the mother vessel, and the pending freight for cargo aboard the Lash barges and mother vessel.

The Fifth Circuit in *Wirth, Ltd. v. S.S. Acadia Forest*, 537 F.2d 1272 (5th Cir. 1976) has already set up appropriate guidelines for deciding what vessels and freight to include in arriving at a value for limitation purposes when that Court decided the issue of whether a Lash barge was a vessel under COGSA. The Court ultimately held that one must consider the entire venture undertaken by the Lash barges and the mother vessel in determining whether Lash barges were vessels in foreign commerce and thus COGSA vessels. In concluding that both the Lash barges and the mother vessel were critical components of the total venture in foreign commerce, the Court held that the Lash barge was a vessel and in foreign commerce even though designed to be carried by the mother ship. *Wirth, Ltd., supra*, at p. 1278.

In discussing the rectitude of using the "single venture" principle, the Court referred to other legal areas where courts have used the single venture principle in resolving maritime legal questions. One particular reference that the Fifth Circuit made was to prior court decisions that applied the single venture principle to issues involving the limitation of liability of vessel owners. Specifically, these courts, in allowing a vessel owner to limit its liability where found liable on a contractual basis rather than a tortious basis, have considered all vessels involved in the common transportation enterprise in which the cargo was damaged to be one vessel for limitation purposes. The Fifth Circuit in *Wirth, Ltd., supra*, stated:

Likewise, courts construing the Shipowners' Limited Liability Act, 46 U.S.C.A. §§ 181–89, have held that when vessels are engaged in a common transportation enterprise they should often be considered one vessel for limitation purposes. In *Short v. The Columbia*, 9 Cir., 1896, 73 F. 226, the Court held in a case factually similar to ours that the barge and tug were one vessel for limitation of liability

purposes. Similarly, in *Standard Dredging Co. v. Kristiansen*, 2 Cir., 1933, 67 F.2d 548, cert. denied, 1934, 290 U.S. 704, 54 S.Ct. 372, 78 L.Ed. 605, the Court held that the owner must surrender all those vessels which share in the execution of the venture, and the Court further stated they were collectively viewed as one vessel.

More recently, this Circuit in reliance on the single vessel theory held that the entire flotilla of barges engaged in a common maritime dredging operation should be surrendered for limitation of liability purposes. . . . (537 F.2d at 1283)

The Fifth Circuit, in a footnote, cited language from *Standard Dredging Company v. Kristiansen*, 67 F.2d 548 (2d Cir. 1933), where Judge Learned Hand discussed the application of the single venture theory to limitation of liability questions. Judge Hand stated:

. . . whatever may be thought of the law before 1927, *Sacramento Nav. Co. v. Salz*, 273 U.S. 326, 47 S.Ct. 368, 370, 71 L.Ed. 663, settled it. True, that case arose under section 3 of the Harter Act (46 U.S.C.A. § 192), but the court expressly declared that the question was the same in cases of limitation. A tug and her barge in tow were treated as a single vessel, because owned in common and engaged in a common enterprise, and the doctrine of *The Columbia, supra* (C.C.A.) 73 F. 226, was used as the keystone of the reasoning. The court thought *Liverpool, etc., Nav. Co. v. Brooklyn Eastern Terminal, supra*, 251 U.S. 48, 40 S.Ct. 66, 64 L.Ed. 130, plainly distinguishable; it was concerned with "a pure tort; no contractual obligations were involved." When they are, it is possible to regard an "entire flotilla * * as one vessel for the purposes of the undertaking in which the common owner was engaged." In that case the relevant inquiry is, "what constituted the vessel by which the contract of transportation was to be effected." In view of this language and of the use made of *The Columbia, supra* (C.C.A.) 73 F. 226, when the duty involves "contractual obligations," the whole flotilla embarked in the enterprise is the "vessel"; a conclusion which would comprise not only the barge here, but the two attending tugs as well.

We do not so understand *Sacramento Nav. Co. v. Salz, supra*, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663; rather we read it as meaning that when the duty violated, though imposed by law, presupposes at least the relation of master and servant, the owner must surrender all those vessels which share in the execution of the venture; collectively they are "such vessel" within R.S. § 4283 (46 U.S.C.A. § 183). 67 F.2d at 550–51 (537 F.2d 1283, n.43)

When considering the holding in *Wirth, Ltd., supra*, and the line of jurisprudence adopting the single enterprise principle in limitation of liability matters, this Court is led to a single conclusion—that the SS ATLANTIC FOREST as mother vessel and all Lash barges consigned to the particular voyage to New Orleans must be considered in setting the limit of liability for the cargo carrier. The Fifth Circuit has held that the mother vessel and the Lash barges are all component parts of a single venture. Judge Learned Hand in *Standard Dredging Company, supra*, has determined that the value of all vessels in the single enterprise and their pending freight must be considered in arriving at the value for limitation purposes.

Argument might be made that since Lash Barge CG–063 was apart from the mother vessel when the cargo casualty occurred, the barge alone should be considered for limitation purposes. Judge Hand in *Standard Dredging Company, supra*, addressed a very similar argument and held that single enterprise and not physical connection was a controlling factor in deciding what was to be included for evaluation purposes. The Court reasoned:

The only questions for us are whether the physical connection of the craft is material, and whether the National Dredging Company's duty to Kristiansen "involved contractual obligations." As to

the first, it is quite true that, except for *Thompson, etc., Ass'n v. McGregor, supra* (6 Cir. C.C.A.) 207 F. 209, in the District Court, this is the only instance we have found, in which the injured party has sought to hold a vessel, separated from that on which the injury took place. Perhaps separation might serve as a practical rule of thumb; we are quite aware of the restriction upon the right to limit which must follow upon making functional unity the test. But there is really nothing in reason to be said for such a doctrine; it exposes the remedy of the injured party to the merest sport of chance. It would for example be a strange whimsy to say that the dredge must here have been surrendered, had the barge happened to be made fast alongside, but that she need not, because there was a thousand feet of water between them. Surely that cannot be a significant difference, when substantial interests are at stake. Even as the law is, there may be strange results. If, for example, Kristiansen had mishandled the barge's anchor and set her adrift, so that she fouled another barge nearby, or injured some one on board, we understand that the barge alone would have to be surrendered; indeed, in an action in personam against the National Dredging Company, only its interest in her as bareboat charterer. But at least there is a consistency in legal theory in that, though it may be only of historical origin. When, however, the unity of the vessels is made to depend upon their devotion to a single venture, it would be egregious to introduce a purely fortuitous condition which can have no rational relation to the interests involved. We conclude that separation is immaterial. (67 F.2d at 550)

Likewise, separation of the Lash barge from the mother vessel at the point of cargo casualty is of no significance. The true test is that the Lash barges and the mother vessel are all part of the same common venture.

Therefore, and in consideration of defendant Central Gulf's defense for limitation of liability pursuant to 46 U.S.C. § 183, et seq., this Court concludes that Central Gulf has the right to limit its liability to the extent of the value of the SS ATLANTIC FOREST, all Lash barges consigned to this voyage to New Orleans aboard the SS ATLANTIC FOREST, and the pending freight for cargo aboard the Lash barges and the mother vessel.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction of the parties and of the subject matter of this action under Article 3, § 2 of the Constitution of the United States and under Title 28, U.S.C. § 1333.

(2) The rights of the parties are governed by the Carriage of Goods by Sea Act, Title 46, U.S.C. § 1300, et seq., and the Limitation of Liability Act, Title 46, U.S.C. § 181, et seq.

(3) Defendant Central Gulf could not show any negligence in the navigation of Lash Barge CG–063 and therefore the carrier is not exempt from liability under COGSA, § 1304 2(a).

(4) Defendant Central Gulf breached its duty to properly and carefully keep and care for the cargo in its custody when said cargo was negligently damaged by a towage company hired by the carrier, and therefore the carrier is not exempt from liability under COGSA, § 1304 2(q).

(5) Having failed to exonerate itself from liability by bringing the cause of the damage under one of the exempted clauses in COGSA, the defendant Central Gulf, as carrier, is liable for those damages suffered by Agrico, as owner of the damaged cargo.

(6) The shipowner, Central Gulf, had no knowledge or privity of the negligence in navigation that caused damage to the cargo nor was the Lash Barge CG–063 unseaworthy, and therefore Central Gulf may limit its liability to the cargo owner to the value of the SS ATLANTIC FOREST, the Lash barges consigned to the particular venture to New Orleans, and the pending freight for cargo aboard the Lash barges and the mother vessel.

(7) The negligent navigation of the three-barge tow caused the cargo owner, Agrico, to suffer damage through loss of cargo or shortage thereof in the amount of $88,203.27.

(8) Plaintiffs are not entitled to recover costs and attorney's fees for proving good condition of the cargo upon delivery to Central Gulf since defendants, prior to trial, had reasonable grounds to believe that they might show that the cargo was not in good condition.

The plaintiffs and defendants are to prepare a survey of the SS ATLANTIC FOREST and those Lash barges consigned to the mother vessel for the voyage with destination to New Orleans on May 15, 1975, or if possible, stipulate that the value of these vessels and freight does exceed the amount of the damages, if such is true. At that time, judgment shall enter in favor of plaintiff, Agrico Chemical Company, Inc., and against defendant, Central Gulf Contramar Line in the amount of $88,203.27.