820 F.2d 546
 1987 A.M.C. 2324
 INSURANCE COMPANY OF NORTH AMERICA, Plaintiff-Appellee,
v.
S/S "GLOBE NOVA" her engines, tackle, boilers, etc., The
Globe Tankers, Globe Transport and Trading Company Ltd.,
Willow Grove Shipping Company Ltd., Gamma Shipping Co., Inc.
and Globe Tanker Services, Inc., Defendants.
The Globe Tankers, Globe Transport and Trading Company Ltd.,
Gamma Shipping Co., Inc. and Globe Tanker Services
Inc., Defendants-Appellants.
 No. 256, Docket 86-7550.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 14, 1986.
Decided June 2, 1987.
 
 David L. Mazaroli (Law Offices of Yorkston W. Grist, P.C., New York City, of counsel), for plaintiff-appellee Ins. Co. of North America.
 Hollis M. Walker, Jr. (Constantine W. Papas, Walker & Corsa, New York City, of counsel), for defendants-appellants The Globe Tankers, Globe Transport and Trading Co., Ltd., Gamma Shipping Co., Inc. and Globe Tanker Services, Inc.
 Before FEINBERG, Chief Judge, and WINTER and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Plaintiff-appellee Insurance Company of North America brought this action in the Southern District of New York for damages arising from an alleged shortage in a shipment of molasses. After a bench trial before Chief Judge Constance Baker Motley, judgment was entered for plaintiff. Defendants appealed, and we now reverse.
 
 BACKGROUND
 
 2
 The Insurance Company of North America sues as the subrogee of its insured, Namolco, A.G., the purchaser, and International Molasses, Ltd., the recipient, of the molasses. The defendants, related companies engaged in ocean transport of cargo, are Gamma Shipping Co., Inc., the owner of the S/S Globe Nova; Globe Transport & Trading Company Ltd., the chartered owner of the ship; and Globe Tanker Services Inc., also known as Globe Tankers, its operating manager.[1]
 
 
 3
 On February 3, 1983, a charter party was entered into between Globe Transport and Trading Company Ltd. and Willow Grove Shipping Company Ltd. for the shipment of molasses. On March 29, 1983, the State Trading Corporation of India delivered molasses to the defendants and the Globe Nova at Bombay, India, pursuant to a letter of credit with Namolco, A.G. and several banks. The delivered cargo was weighed on board the Globe Nova by the "draft survey" technique, which compares the depth of the vessel in the water before and after loading to determine the amount of cargo delivered. The measurement indicated that the ship received 15,522.778 metric tons of molasses, and the carrier issued a negotiable on board bill of lading for that amount to the seller.
 
 
 4
 The Globe Nova then sailed on to Kandla, India, where the State Trading Corporation delivered another 3,429.478 metric tons of molasses, as measured by the draft survey method, for which another negotiable on board bill of lading was issued. The Globe Nova at this juncture had 18,952.256 metric tons of molasses, as measured by the draft surveys and reflected by the bills of lading.
 
 
 5
 The vessel then sailed to Felixstowe, England, arriving on April 25, 1983, where the receiver of the molasses, International Molasses, Ltd., operated a shore storage facility. Upon the Globe Nova's arrival in Felixstowe, an employee of International Molasses measured the ship's cargo by a draft survey. Approximately half of the ship's cargo was discharged from the ship to the Felixstowe tanks through offshore pipelines. When the process was completed, another draft survey was taken. According to the draft surveys, 9,088.57 metric tons of molasses were outturned through the ship's permanent hose connection, and thus delivered to the Felixstowe storage facility.
 
 
 6
 The Globe Nova then travelled to Hull, England, where it delivered molasses to another International Molasses facility. The draft surveys conducted at Hull indicated that 9,846.79 metric tons passed through the permanent hose connection. The draft surveys at the two ports thus showed an insignificant shortage, which the district court held to be nonactionable.
 
 
 7
 The shore tanks at Felixstowe and Hull, however, were equipped with pneumercators, high precision measuring devices. Those devices are apparently far superior to draft surveys at measuring accurately the amount of molasses transferred to the tanks. According to the pneumercators, 9,074 metric tons were transferred to the tanks at Felixstowe and 9,625 metric tons were transferred to the Hull tanks. Thus the tank gauges showed a total of 18,699 metric tons of molasses, for a shortage of 253 metric tons when compared to original draft survey figures. Plaintiff brought this suit for damages resulting from the shortfall under the Carriage of Goods by Sea Act, 46 U.S.C. Secs. 1300-1315 (1982) ("COGSA"),[2] and was awarded a judgment of $48,502.62, with interest, for the non-delivery of 253 metric tons of molasses after a non-jury trial before Chief Judge Motley. 638 F.Supp. 1413.
 
 DISCUSSION
 
 8
 Plaintiff establishes a prima facie case under COGSA by showing delivery of the cargo in satisfactory condition to the carrier and arrival of less cargo than was delivered. Spencer Kellogg, Division of Textron, Inc. v. S.S. "Mormacsea", 703 F.2d 44, 46 (2d Cir.1983); see also Westway Coffee Corp. v. M.V. Netuno, 675 F.2d 30, 32 (2d Cir.1982) (as to damaged condition). The burden then shifts to defendant to prove one of the defenses provided in 46 U.S.C. Sec. 1304 (1982). Westway, 675 F.2d at 32.
 
 
 9
 The issue in this case is simply what the proper measure of the outturn is. The parties agree that if the amount delivered was deficient, Globe is liable for the shortage. See Berisford Metals Corp. v. S/S Salvador, 779 F.2d 841, 847-48 (2d Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 2928, 91 L.Ed. 2d 556 (1986). The amount loaded was determined by the draft-survey method, and the amount thus determined is the only figure available for comparison. The alleged shortage was discovered by comparing the draft survey measure with the pneumercator readings. The draft survey measure is a relatively imprecise method, but when compared to another draft survey measure, can be used to determine if cargo has been lost.
 
 
 10
 Courts generally hold that the same methods of measurement should be used at delivery and offloading, and that offloading measurements should be made on board the vessel. See, e.g., Unilever/Lever Bros. (PTY) Ltd. v. M/V Stolt Spur, 583 F.Supp. 139, 142-43 (S.D.Tex.1984); Wesco International, Inc. v. M/V Tide Crown, 1985 A.M.C. 189, 195-97 & n. 8 (S.D.Tex.1983) (use of different modes of measurement would be "comparing apples and oranges"); Kerr-McGee Refining Corp. v. M/V La Libertad, 529 F.Supp. 78, 83-85 (S.D.N.Y.1981); Northeast Petroleum Corp. v. S.S. Prairie Grove, 1977 A.M.C. 2139, 2142-43 (S.D.N.Y.1977) (Pierce, J.); Esso Nederland v. M.T. Trade Fortitude, 1977 A.M.C. 2144, 2147 (S.D.N.Y.), aff'd mem., 573 F.2d 1294 (2d Cir.1977); Centerchem Products, Inc. v. A/S Rederiet Odfjell, 1972 A.M.C. 373, 375-76 (E.D.Va.1971); Dow Chemical Co. (U.K.) v. S.S. Giovanella D'Amico, 297 F.Supp. 699, 707-08 (S.D.N.Y.1969); see also Palmco Inc. v. American President Lines, Ltd., 1978 A.M.C. 1715, 1720 (D.Or.1978) (use of varying methods to determine difference increases inaccuracy, but court used shore tank measures where no measures were made on the ship). But see Amoco Oil Co. v. M/V Lorenzo Halcoussi, 1984 A.M.C. 1608, 1612, 1614-15 (E.D.La.1983)(using shore measures because ship's measures were "admittedly inaccurate").
 
 
 11
 In these cases, as in the present one, delivery of the cargo was completed at the "vessel's permanent hose connections."[3] At that point, the shipowner's liability ends, the risk of loss shifts, and a plaintiff cannot make out a prima facie case under COGSA by showing later measurements. Courts give various reasons for this result, including that it is unfair to require the shipowner to inspect and be responsible for the shore facilities, see Northeast Petroleum Corp., 1977 A.M.C. at 2143; Centerchem Products, Inc., 1972 A.M.C. at 375, and that the charter agreement makes the delivery complete at the outturn and evidence of later measurements is thus irrelevant, Wesco International, Inc., 1985 A.M.C. at 196. We agree and find that the district court erred in failing to use the same method for measuring cargo at offloading that was used at delivery.
 
 
 12
 Plaintiff appears to argue that since draft surveys are less accurate than pneumercator readings, the draft surveys at unloading should be disregarded, and that since the cases cited did not involve draft surveys, they are distinguishable. Plaintiff stops short of arguing that use of draft surveys was itself negligent, and indeed made no showing below to that effect. Nor did it make a showing that the measurements used in the cited cases were more accurate. The distinction is therefore unsupported, and we decline to hold on this record that those who use draft surveys do so at their peril. Cf. Morton v. Berman Enterprises, 669 F.2d 89, 91-92 (2d Cir.1982).
 
 
 13
 The district court stressed the fact that a bill of lading was issued for the molasses, emphasizing that since bills of lading "are heavily relied upon by buyers in arranging for payment via letters of credit, the importance of holding a carrier to the representations made in a bill of lading should be obvious." COGSA provides, however, that bills of lading are only "prima facie evidence" of their contents, see 46 U.S.C. Sec. 1303(4) (1982). In this case, in any event, the parties do not dispute that the quantity specified in the bills of lading was actually loaded aboard the Globe Nova. Therefore, the controversy concerns only whether that same quantity was offloaded, and the reliability of the bills of lading is not directly at issue.
 
 
 14
 Strong reliance was placed below upon Berisford Metals Corp. v. S/S Salvador, 779 F.2d 841 (2d Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 2928, 91 L.Ed.2d 556 (1986), a case in which this court held a carrier liable for a shortage of seventy (out of a hundred) bundles of tin ingots. There, however, the goods were delivered to the carrier at a shore terminal; the carrier, for its convenience, placed the bundles into four larger containers which were locked and sealed; and no check was made when the containers were loaded on the ship that the bundles were still in the containers, even by weighing the containers (whose weight had been reduced from 111,656 pounds to 32,771 pounds by removal of the seventy bundles). No similar conduct occurred here, and no persuasive reason is advanced for ignoring the normal rule (which had no application in Berisford Metals) that the same methods of measurement should be used at delivery and offloading, and that offloading measurements should be made on board the vessel.
 
 
 15
 The judgment of the district court is therefore reversed and remanded with instructions to enter judgment for the defendants.
 
 
 
 [1]
 Willow Grove Shipping Company Ltd., the charterer of the Globe Nova for the voyage in question, has apparently never been served as a defendant in this action
 
 
 [2]
 Although COGSA applies only to "contracts for carriage of goods by sea to or from ports of the United States in foreign trade," see 46 U.S.C. Sec. 1312 (1982), and therefore is not applicable by its terms here, the parties contracted in their charter party (which was incorporated by reference in the bills of lading) to be governed by U.S. law, and thus by COGSA
 
 
 [3]
 The terms of the February 3, 1983 charter party contained the following provision:
 The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its Consignee.
 Charter Party cl. 7 (emphasis added).