ROYAL INSURANCE COMPANY OF AMERICA, Plaintiff,

v.

S/S ROBERT E. LEE, S/S STONEWALL JACKSON, their engines, tackle, apparel, etc., BARGE WA 1–0170, in res, Waterman Steamship Corporation, Amsouth Bank, N.A., in personas, Defendants.

No. 89 Civ. 1532 (BN).

United States District Court, S.D. New York.

Jan. 24, 1991.

Kennedy & Lillis, New York City (Donald M. Kennedy and Susan M. Dorgan, of counsel), for plaintiff.

Burlingham, Underwood & Lord, New York City (Joseph C. Smith, of counsel), for defendants.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the Court of International Trade, sitting as a District Court Judge by designation:

### INTRODUCTION

Royal Insurance Company of America ("Royal"), an Illinois corporation with office and place of business in New York, brings this admiralty action pursuant to the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1300, *et seq.* (1936), against Waterman Steamship Corporation ("Waterman"), a Delaware corporation also with office and place of business in New York and Amsouth Bank, N.A. ("Amsouth"), an Alabama corporation with office and place of business in Alabama, *in personas,* and the S/S ROBERT E. LEE, S/S STONEWALL JACKSON and Lash BARGE WA 1–0170 ("BARGE WA 1–0170" or "the barge"), *in res,* seeking to recover damages of $111,989.54 plus interest commencing from April 11, 1988, representing the value of cargo damage to 6,606 bags of wheat flour transported by Waterman from Helena, Arkansas to Berbera, Somalia aboard BARGE WA 1–0170.

Engaged in business, *inter alia,* as an insurer of goods, Royal insured the 6,606 damaged bags against risk of loss or damage during their transportation for The World Food Programme ("WFP"), owner of the shipment which is the subject matter of this action.[1] On March 2, 1989 Royal paid to WFP the sum of $108,313.00 constituting the insured value of the damaged cargo. As an incident to the payment, WFP subrogated to Royal all of its rights against carriers responsible for damage to the cargo.

Seeking damages as subrogee, Royal alleges that Waterman, a common carrier of goods by sea and owner of the Lash vessels S/S ROBERT E. LEE and S/S STONEWALL JACKSON, failed to exercise due diligence in making BARGE WA 1–0170 (owned by Amsouth) seaworthy for the intended voyage, and failed to exercise due care in keeping and caring for the cargo during its period of transportation aboard the barge. *See,* 46 U.S.C.App. §§ 1303(1), 1303(2) (1936). Waterman seeks dismissal of the complaint responding that BARGE WA 1–0170 was seaworthy at the commencement of the voyage. Also, conceding that negligence by one of tugboats under Waterman's direction caused damage to BARGE WA 1–0170 and its cargo, Waterman claims excusal from liability pursuant to the COGSA defense of error in the navigation and management of the barge. *See,* 46 U.S.C.App. §§ 1304(1), 1304(2)(a) (1936).

Maritime jurisdiction exists under 28 U.S.C. § 1333 (1988). In accordance with Fed.R.Civ.P. 52(a), the court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Background*

Shipment from Helena to Newport News

On February 2, 1988 Waterman delivered BARGE WA 1–0170 to the shipper in Helena for loading, and on February 5, 1988 Waterman conducted an inspection of the barge indicating it to be clean, dry and without leaks (deft's exh. E). Further on February 5, WFP delivered to Waterman a shipment of 27,036 bags of wheat flour, then in apparent good order and condition, for carriage by water from Helena to Berbera and thence delivery to WFP representatives. Of the 27,036 bag shipment, BARGE WA 1–0170 was loaded with 7,482 bags weighing 369.09 long tons and was drawing 8'6¾", the barge's maximum salt water draft when fully loaded with cargo (Tr. 168). Subsequently, Waterman issued its bill of lading number 5, dated March 5, 1988, acknowledging the apparent good order and condition of the shipment and its undertaking to carry the shipment.[2]

BARGE WA 1–0170 was towed from Helena on February 7 by the tug boat GIRLIE KNIGHT arriving the next day in New Orleans, Louisiana; on March 5, BARGE WA 1–0170 was loaded on-board S/S ROBERT E. LEE for carriage to Newport News, Virginia.[3] S/S ROBERT E. LEE arrived with its cargo at Newport News on March 9.

Newport News Pier 15 and Fleering Area

At Newport News, BARGE WA 1–0170 and other Lash barges were discharged without incident from S/S ROBERT E.

1. WFP is an instrumentality of the Food and Agricultural Organization, an agency of the United Nations which, *inter alia,* is engaged in the business of obtaining food from member nations for shipment and distribution to like member nations.

2. Although the bill of lading is dated March 5, it appears the bill of lading was actually issued sometime near the beginning of February.

3. The LASH system (Lighter Aboard Ship) is an alternative mode of cargo carriage designed to facilitate loading and transport of cargo from various points on inland waterways and rivers which are not easily traversed by deep draft ocean carriers. Specially designed Lash barges laden with cargo are towed from inland loading stations and fleeting or mooring areas to deep water ports where they are brought alongside specially equipped Lash or mother vessels which lift the barges on-board for the ocean portion of the voyage. When the ocean vessel arrives at the deep water destination point, the barges are off-loaded and towed to fleeting areas for continued transport inland.

LEE. On March 9 at 1725 hours, BARGE WA 1–0170 arrived at the C & O coal pier at Newport News Point ("pier 15") towed by the tug boat MISS OPAL. At 2215 hours MISS OPAL further towed the barge to the M & W Marine Services, Inc. mooring ("fleeting area") utilized to secure Lash barges and other barges, located inside of a protective jetty just east of the north island of the Bridge Tunnel at Newport News (deft's exh. H, J).[4] BARGE WA 1–0170 was nested together with three other barges alongside a drydock. The barges, including BARGE WA 1–0170, were then attached to a larger group of barges secured to mooring buoys where the depth was 15 feet (deft's exh. P, Q, J).

BARGE WA 1–0170 remained in the fleeting area from March 9 to April 9, the day before the barge was loaded on-board the mother vessel S/S STONEWALL JACKSON for the ocean portion of the voyage to Berbera (deft's exh. I; Tr. 18–19). At 1915 hours on April 9, BARGE WA 1–0170 was towed from the fleeting area to pier 15 by the tug boat LADY JANICE for loading on-board S/S STONE-WALL JACKSON at the anchorage. BARGE WA 1–0170 remained at pier 15 until towed to the ship anchorage area on April 10, whereupon at 1720 hours BARGE WA 1–0170 was uplifted for loading on-board S/S STONEWALL JACKSON.

Damage to BARGE WA 1–0170

During the loading process, water was observed pouring from a slightly L-shaped vertical puncture approximately 4″ long and ½″ wide, located 3″ forward of the lifting post aft on the starboard side at the 7′10½″ draft mark (deft's exh. T, Z, EE; Tr. 124, 126–128).

Waterman's Port Engineer and manager of barge maintenance and repair, Charles Pryor ("Pryor"), sent a telex to S/S STONEWALL JACKSON instructing the crew to drill a hole and determine whether water had entered the barge. Thereupon, a crew member drilled a ½″ hole on the

starboard side of the shell plating, 30″ above the bilge knuckle amidship releasing the water that, in fact, had infiltrated the barge. The drain hole was plugged and temporary repairs to the puncture were effected by means of a hand patch, that prevented water from draining back into the cargo compartment when the damaged barge was discharged from the vessel for repair in New York.

The pontoon covers of the barge were opened on April 12, between 0810 and 0830 hours, and Waterman's surveyor, Seaspan Marine Consultants, Inc. ("Seaspan") reported a heavy odor of fermentation emanating from the barge. Seaspan also reported that between 20 to 40 tons of water had entered the barge, flooding the cargo to a height of 7′5″ (pltf's exh. 5). Accordingly, the cargo on-board BARGE WA 1–0170 was segregated, with the result that 876 bags were ascertained sound and forwarded to destination, while 6,606 bags were found water damaged and determined to be a total loss (deft's exh GG; pltf's exh. 5). Waterman eventually disposed of the unsound bags, and this action concerns damages sought for the value of the discarded bags of wheat flour.

*Discussion: Liability Under COGSA*

■ This admiralty action falls within the scope of COGSA, a codified framework governing the determination of liability for damage or loss arising out of cargo carriage to and from United States ports. Relevant to any discussion of COGSA is an analysis of its pertinent substantive provisions, and the corresponding proof scheme that dictates COGSA's application in litigation. The liability for a particular loss usually depends upon two fundamental obligations imposed upon cargo carriers: "the duty to use due care with respect to the cargo, and the duty to use due diligence to furnish a seaworthy vessel." *In re Intercontinental Properties Management, S.A.,* 604 F.2d 254, 261 (4th Cir.1979) (*cit-*

---

**4.** Waterman's ship and barge operation at Newport News was handled by Eastern Shore Diving Marine Services ("Eastern Shore"), and by a related company, M & W Marine Services, Inc. ("M & W"). Eastern Shore owned the tug boats that moved and fleeted Lash barges for Waterman in the Norfolk area and M & W handled the Lash barges for Waterman including hauling or moving, cleaning, repair, maintenance and inspection of the barges (Tr. 79, 7–9).

*ing* G. Gilmore & C. Black, *The Law of Admiralty* §§ 3–23,–26 (2d ed. 1975)). As further explained by the *In re Interconti-nental Properties Management* court:

> COGSA defines the substantive scope of these two obligations in their now codified form in two sets of paired sections each of which defines the general duty and sets out its limits or qualifications. Sections 3(1) and 4(1) together impose (actually in mirror image statement of duty and immunity) an obligation to exercise *due diligence* to provide a seaworthy ship "at the beginning of the voyage." Sections 3(2) and 4(2) together define the *"due care"* obligation by posting in § 3(2) a general duty to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried," then laying out in § 4(2) sixteen specific, (a)–(p), and one catch-all (q), causes of loss or damage to cargo that serve to limit the scope of the duty as generally defined in § 3(2). *Id.* at 261–62 (emphasis supplied).

These four interrelated sections effectively permit the cargo owner to establish ocean carrier liability on two separate "due diligence" theories, and the cargo carrier to limit liability exposure for its failure to exercise due diligence respecting the cargo. For the reasons which follow the court finds that Waterman, though able to establish the seaworthiness of BARGE WA 1-0170 at the commencement of the voyage in Helena, has failed to exercise due diligence in keeping and caring for the cargo, which failure caused the cargo damage. Further, Waterman falls short of exonerating its negligent conduct under the 46 U.S. C.App. § 1304(2)(a) defense of error in navigation or management of the barge.

### Seaworthiness

█ Initially, Royal raises the issue that Waterman failed to exercise due diligence to provide a seaworthy barge for the intended voyage. That issue can be quickly resolved, since the uncontradicted evidence establishes that Waterman fulfilled its duty to the cargo owner under 46 U.S.C.App. § 1303(1)(a) and § 1304(1) in exercising due diligence to make the barge seaworthy at the commencement of the voyage. On January 15, 1987 the barge was audiogaged at S/S Barge Maintenance, Inc. in Savannah, Georgia which established the steel thicknesses of the barge at certain critical points. Indeed, the steel thicknesses at the location where the puncture occurred was within several thousandths of an inch of .250 or ¼", the thickness of the plating as originally installed. More, in July 1987 the American Bureau of Shipping ("ABS") conducted a special intermediate ship's survey and "recommend[ed] that [BARGE WA 1-0170] be retained as Classed with [ABS]" (Tr. 102, 104, 106–9; deft's exh. B, D). Finally, on February 5 the barge was inspected by Waterman personnel in Helena before loading and was found clean, dry and fit for the carriage of cargo. (deft's exh. E).

Royal argues, however, that the best evidence of the seaworthiness of the barge in terms of the area in and around the puncture is the very steel section which Waterman discarded after repair of the barge, and thus Royal could not assess the condition of the skin of the barge at the exact point of the puncture. But the unrebutted evidence demonstrates that the area around the puncture had been found to contain uniform thickness in July 1987. Hence, Royal's inability to inspect the particular steel section discarded by Waterman, although somewhat handicapping, did not prohibit Royal from conducting its own inspection of the surrounding steel plating area to rebut Waterman's credible evidence in favor of seaworthiness. Royal chose not to undertake such an inspection. Consequently, the court finds that Waterman exercised due diligence to make BARGE WA 1-0170 seaworthy at the inception of the voyage.

### Royal's Prima Facie case

█ Royal's central argument is that Waterman failed to exercise due diligence to properly keep and care for the cargo aboard BARGE WA 1-0170 resulting in the water damage to the cargo. A cargo owner makes a *prima facie* case of liability against an ocean carrier for loss or damage to goods by proving that the carrier re-

ceived the cargo in apparent good order and condition and that the cargo was either damaged upon delivery or not delivered. *Insurance Co. of North America v. S/S "Globe Nova",* 820 F.2d 546, 548, 1987 AMC 2324, 2329 (2d Cir.1987), *cert. denied,* 484 U.S. 965, 108 S.Ct. 454, 98 L.Ed.2d 394, 1988 AMC 2399 (1987); *M. Golodetz Export Corp. v. S/S LAKE ANJA,* 751 F.2d 1103, 1109, 1985 AMC 891, 899 (2d Cir. 1985), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2361, 86 L.Ed.2d 261, 1985 AMC 2398 (1985). The cargo owner is not required to prove that the carrier was at fault; nor is the cargo owner required to explain how the loss ·or damage occurred. *M. Golodetz Export Corp.,* 751 F.2d at 1109, 1985 AMC at 899; *Nissho–Iwai Co., Ltd. v. M/V STOLT LION,* 617 F.2d 907, 912, 1980 AMC 867, 872 (2d Cir.1980).

Clearly, Royal has sustained its burden of making a *prima facie* case regarding Waterman's liability for the damage to the cargo on-board BARGE WA 1–0170. The parties stipulated that WFP delivered to Waterman a shipment of 27,036 bags of wheat flour, then in apparent good order and condition, for carriage by water to Berbera and delivery to WFP representatives; that Waterman issued its bill of lading acknowledging the apparent good order and condition of the cargo at the time of shipment; and that the cargo was out-turned in a partially damaged condition (PTO 2–3).

*Error in Navigation*

▆▆ After the cargo owner (Royal) carries the *prima facie* burden of demonstrating clean delivery and cargo damage during transport or upon discharge, the order of proof shifts to the ocean carrier (Waterman) to affirmatively show by "significant probative evidence" that it exercised due diligence under 46 U.S.C.App. § 1303(2) which states:

> [t]he carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried (46 U.S. C.App. § 1303(2) (1936))

or failing the exercise of such due diligence, that any negligent conduct resulting in damage to the cargo falls under one of the excepted causes of § 1304(2). *Sankyo Seiki (Am.), Inc. v. S.S. "KOREAN LEADER",* 556 F.Supp. 337, 340, 1984 AMC 1787, 1790 (S.D.N.Y.1982), *aff'd mem.,* 723 F.2d 895, 1984 AMC 1796 (2d Cir.1983); *M.W. Zack Metal Co. v. S.S. BIRMINGHAM CITY,* 311 F.2d 334, 337 (2d Cir.1962), *cert. denied,* 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963). Here, Waterman maintains exercising due diligence pursuant to the requirements of § 1303(2), but admits that a tugboat under Waterman's direction negligently navigated BARGE WA 1–0170 and damaged its cargo. For this reason, Waterman seeks to limit its liability relying on § 1304(2)(a) which states that a carrier shall not be responsible for the damage to cargo arising or resulting from an:

> [a]ct, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship (46 U.S.C.App. § 1304(2)(a) (1936)).

Significantly, the reverse side of the bill of lading issued by Waterman, under clause 4 entitled CARRIERS, SERVANTS, CONTRACTORS, ETC., provides to those entities employed by the carrier:

> to assist in the performance of all work and services undertaken by [the carrier] in connection with the cargo described [in the bill of lading] ... *the benefit of all rights, defenses, exceptions and immunities from and limitations of liability of whatsoever nature which the carrier has under this bill of lading ... and under the U.S. Carriage of Goods by Sea Act* [COGSA] (deft's exh. A; emphasis supplied).

As mentioned heretofore (fn. 4 *supra*), Eastern Shore and M & W operated Waterman's ship and barge operation at Newport News.

Waterman's theory of how the accident occurred appears to be based largely upon the testimony of Captain Gregory Conn ("Conn") and Pryor. In March and April of 1988, Conn was employed by Eastern Shore as an engineer or deck hand on the tug boat LITTLE MARY and was principally responsible for monitoring the barges at

the fleeting area. Conn opined that the tug boat LADY JANICE, owned by Eastern Shore, was navigating BARGE WA 1–0170 from pier 15 when the barge was holed, and that the resulting puncture was due to an error in navigation on the part of the crew of LADY JANICE. Allegedly, the barge's starboard side aft was pressed against a submerged horizontal section of wood used for reinforcement of the pier called a "whaling," causing an indent and a puncture just forward of the barge's lifting post (Tr. 73; deft's post-trial brief at 3). Pryor corroborated Conn's opinion, predicated upon Pryor's scrutiny of photographs of pier 15 that he first became aware of during the course of discussions the day before the commencement of trial (Tr. 131).

In addition to the fact testimony of Conn and Pryor, Waterman's theory depends upon a photograph of the damage to BARGE WA 1–0170 (deft's exh. Z) and photographs of Pier 15 (deft's exh. L, O). Finally, Waterman also relies upon the expert testimony of Professor Norman A. Hamlin[5] ("Hamlin") and the latter's calculations estimating the time required to flood the barge following penetration of the shell plating and the quantity of water which entered the barge.

Based on the totality of the evidence it submitted, Waterman insists that the damage could only have been sustained at pier 15 "while the barge was moving forward and while a pressure was being applied sideways" (deft's post-trial brief 9). Waterman concludes that "only a tugboat moving the barge forward and turning the head of the barge away from the pier at the same time could exert the forces to press the starboard aft side of the barge against the whaling" (*Id.*).

In support of its allegation regarding navigational error on the part of LADY JANICE, Waterman refers the court to the general legal proposition cited in *Wirth, Ltd. v. S.S. ACADIA FOREST*, 537 F.2d 1272, 1279 (5th Cir.1976), *reh'g. denied*, 541 F.2d 281 (5th Cir.1976). In *Wirth*, the court states that "a navigational error committed by the captain or crew of the tug responsible for the movement of [a] LASH barge, which error results in damage to the cargo of the LASH barge, exempts the carrier from liability to cargo."

Royal agrees with the general legal proposition cited by Waterman but maintains that, here, carrier liability exists for the reason that Waterman failed to sustain its burden of proving that BARGE WA 1–0170 was being navigated at the time it was holed, and that the hole was caused by an error in the navigation of the barge. *Agrico Chem. Co. v. S.S. ATLANTIC FOREST*, 459 F.Supp. 638, 645 (E.D.La 1978), *aff'd per curiam*, 620 F.2d 487 (5th Cir.1980). Royal suggests that the barge could have been holed as the result of any one of several different types of activity other than in the course of navigating the laden barge.

(1)

First, Royal hypothesizes that the barge could have been holed and the cargo damaged for the reason that Waterman failed to exercise due diligence in the keeping and caring of the cargo during the course of on-going activity at the fleeting area.

Specifically, Royal argues that Waterman allowed the barge to make contact with the bottom (corner) of a drydock which was moored adjacent to the barge. A diagram of the fleeting area barge configuration prepared by Conn illustrates that the flotilla including BARGE WA 1–0170 was moored alongside the drydock and that a space was maintained separating the barge and the drydock (deft's exh. P; Tr. 46). Conn explained that the portion of the drydock below the waterline, approx-

---

5. Hamlin is a registered professional engineer in Massachusetts and a member of several prominent Naval architecture and marine engineering societies and committees. Hamlin has a master's degree in Naval Architecture from the Massachusetts Institute of Technology and has authored many papers and articles on naval architecture and vessel performance. He was employed for 18 years in the Central Technical Department, Shipbuilding Division of Bethlehem Steel Co. Hamlin also spent 23 years as Professor of Naval Architecture at Webb Institute in Glen Cove, New York and 11 years as Adjunct Professor in the Graduate Department of Marine Science at Long Island University.

imately 1' to 1'6" in a light (unloaded) condition, did not contain any objects protruding from it; and Conn dismissed any possibility that the space existed to avoid any contact between the side of the barge and the bottom of the drydock. Nevertheless, Pryor testified that the location of the puncture was at approximately the same depth as the bottom of the drydock (Tr. 132). Also, Conn's diagram introduces the likelihood that the barge and drydock were attached to separate flotillas independently secured by different mooring buoys (deft's exh. P, Q), thereby permitting contact between the barge and the bottom (corner) of the drydock.

Waterman, however, contends that Conn's daily inspections eliminated any possibility that BARGE WA 1–0170 could have been holed in the fleeting area. Continuing, Waterman reasons that BARGE WA 1–0170 would show the effects of the water that flooded her hold occasioned by the 4" puncture below the waterline, allegedly because the additional water would increase the barge's draft by 9" covering the 9' draft mark representing the deepest marking on the shell plating and would thereby alert Conn. But Conn testified on cross-examination that he did not depend upon the draft markings on the barges when conducting his inspections, instead relying on his experienced eye to determine the draft of a particular barge (Tr. 71).

Conn admitted—critically—that he would have difficulty visually noticing whether a barge was drafting a few inches more or less than the maximum draft of 8'6¾". Interestingly, however, Conn was certain that he could tell "instantly" whether a barge was drafting over 9' (Tr. 72). But he also admitted—critically—that it was very possible for water to enter a barge and seek its own level so that the barge itself did not list but rather remained level although submerged slightly more than its appropriate draft (Tr. 68).

Respecting his purported daily barge inspections, Conn testified only regarding his "general practice," and in fact, acknowledged that he did not inspect the barges daily unless he noticed some apparent "trouble" with them (Tr. 65). The court finds Conn's "general practice" consisted merely of visual observations, noting only whether the barges were secured and whether any obvious list or draft problems existed. Conn further stated that upon visual inspection, if a particular barge was drafting deeper than the maximum draft of approximately 8'6", or a barge was listing, or had taut lines or exhibited a difference in freeboard respecting the barges moored with her, Conn knew a "serious problem" existed and would then "sound" the barge for water.[6]

Importantly, Robert Chambers ("Chambers"), Waterman's East Coast cargo layout supervisor in charge of coordinating stowage onboard the ships (Tr. 161), emphasized that even though a barge was holed it could intake 30–40 tons of water "before one would *noticeably notice* the draft would be out of align from where it normally would have been" (Tr. 182; emphasis supplied). Therefore, he added, taking a sounding of the cargo and void areas would have made earlier discovery of water ingress much more likely (*Id.*). Not coincidentally, Waterman requires *daily* sounding and checking for damage of all loaded barges as part of the fleeting area supervision (Tr. 175; emphasis supplied). While Conn was not certain that the Waterman daily sounding requirement existed in March and April of 1988, the plain fact is that Conn admitted failing to sound the barges every day in March and April of 1988 (Tr. 66). And Conn conceded that short of opening the hatches, which is impractical in the mooring, the taking of a sounding was the most thorough manner to determine the presence of water in a barge (Tr. 67).

More, Chambers testified that despite supervision it was not at all uncommon for a Lash barge to sustain damage at the fleet-

6. "Sounding" is the process by which barges are checked for water in the cargo compartment without necessarily opening the hatch. Lash barges have sounding tubes in each corner for checking the water level in the cargo compartment. Additionally, there is a hole on each end of the barge surface for sounding the void area in the barge for water.

ing area, and recalled many occurrences involving such damage to barges (Tr. 68). For that reason, Waterman's manual for Lash barges requires that the barges are to be carefully inspected prior to loading on-board Lash vessels and if a barge is found leaking it should be returned to the fleeting area under normal circumstances (pltf's exh. 14, "Barge Inspection"). Chambers stated that had Waterman properly followed inspection procedures prior to loading BARGE WA 1-0170 Waterman should have detected the damaged condition of the barge and returned it back to the fleeting area (Tr. 169).

Pryor opined, nonetheless, that once the damage was discovered Waterman's decision to continue loading the barge on-board S/S STONEWALL JACKSON was correct under the circumstances. Indeed, Pryor hypothesized that the barge may have been in danger of sinking within the time frame required to return it to the pier or fleeting area. More, Waterman alleges that in retrospect, once the cargo was wetted the damage had been done already, so that removing the cargo immediately would not have lessened the damage.

The court does not agree. Waterman personnel failed to submit *any* credible evidence documenting that the barge was observed to be suspiciously low in the water or in danger of sinking at any time prior to loading. Additionally, at the time of discovery Waterman could not have been aware of the extent of water ingress and had a continuing duty to limit the exposure of the cargo to water damage. In sum, the court finds that Waterman's decision to load the barge conflicted with the requisite procedures for handling a leaking barge, and Waterman failed to establish "[ab]normal circumstances" justifying the circumvention of its own written procedure for proper barge operations.

The court is clear that Conn's actual practice within the fleeting area consisted mainly of cursory inspections, and despite his checking for obvious visual disturbances Conn did not adequately inspect the barges. Furthermore, specific inconsistencies in Conn's testimony suggest that Conn's opinion respecting the cause of the damage to BARGE WA 1-0170 was mere speculation. For example, although Conn testified he could not recall the approximate location or depth of the puncture *viz.* the waterline (Tr. 46), later Conn concluded with certainty that given the position of the whaling and the state of the tide the unprotected edge of the whaling matched up perfectly with the hole in the barge (Tr. 73). In point of fact, Conn did not actually recall the incident resulting in the holing of BARGE WA 1-0170; Conn did not even recall being asked about it, until approximately one week before his deposition in January of 1990 (Tr. 64).

Finally, the court finds that, despite Pryor's opinion as to the cause of the damage, he testified that he never actually learned what caused the incident and instead admitted submitting his opinion predicated upon photographs of pier 15 that he in fact had only first seen on the eve of trial (Tr. 131). Moreover, while Pryor suggested that the condition of the whaling depicted in a photograph of pier 15 "appear[ed] to be the cause of the damage" (*Id.*), he acknowledged that the photograph of the punctured barge (deft's exh. Z), illustrates the puncture was caused by a "sliding motion," meaning that the damage could also have been caused by something hitting the barge, or the barge hitting something other than a pier, or by M & W personnel while moving other barges (Tr. 131-2). Significantly, the photographs of pier 15 were taken by Waterman's counsel approximately seventeen months after the alleged incident, and ultimately neither Pryor nor Conn could conclude from the photographs whether the condition shown in the photographs pre-existed the alleged incident or developed subsequent to the alleged incident.

Waterman's Expert Testimony

Additionally, Waterman adduced expert testimony from Hamlin designed to establish that the approximate time frame when the puncture occurred did not coincide with the time period the barge was moored at the fleeting area. Hamlin based his calculations on several factors, including: esti-

mates of the head or pressure operating at the puncture affecting the rate of water flow into the barge, the estimated discharge coefficient depending primarily upon the size of the hole or opening, estimates of the relative stowage and free space in the hold to elucidate the permeability of the cargo, and the approximate height of the water level in the hold (deft's exh. GG).

Ultimately and predicated on the resulting formula, Hamlin opined that in approximately five hours and forty minutes BARGE WA 1–0170 was flooded with approximately forty tons of water, and that the barge was within a little less than 2″ of reaching a state of equilibrium, the point at which a barge taking on freeflowing water would assume a stationary position, and thereafter change attitude depending on circumstances other than the ingress of water. Significantly, Hamlin warned that his conclusion of the reported flooding time was of necessity an approximation, subject to the data provided, "owing to inherent uncertainties in such calculations" (deft's exh. GG). Waterman, however, argues that Hamlin's opinions substantiate its theory that the barge was not holed at the fleeting area since the barge was towed from the fleeting area some twenty-two hours prior to loading on April 10, and instead was holed shortly prior to loading on-board S/S STONEWALL JACKSON.

Royal's Expert Testimony

Royal vehemently disagrees with Hamlin's calculations and the resulting accuracy of his formula. Thus Royal's arguments include: Hamlin did not have sufficient information with which to accurately calculate the rate of ingress of water into the barge; Hamlin's discharge coefficient was a compromise of a number of published coefficients and then based upon the best average of the coefficient for purposes of the equation, and; Hamlin's estimate of the permeability of the cargo was made even more uncertain by the presence of polyethylene wrapping placed around the cargo for protection.

Moreover, Royal utilized the combined expert testimony of Joseph Winer[7] ("Winer") and Dr. Clyde Stauffer[8] ("Stauffer"), respectively, to specifically rebut Hamlin's findings, and to establish that water had infiltrated the cargo hold for longer than hypothesized by Waterman. Royal insists that their findings support the likelihood that the incident causing the entry of water into the barge occurred sometime before the barge was moved to the mother vessel from pier 15, and that it probably occurred when the barge was at the fleeting area.

Winer conducted a study respecting the rate of entry of water into BARGE WA 1–1070 and respecting the time it would take for the barge to reach equilibrium. The Winer study utilized Stauffer's estimate of the permeability rate of water into flour (discussed *infra*) to determine bag permeability, and assembled data indicating that the stow permeability, or space between the bags in the cargo hold, was 10%. Combining these data figures with certain basic concepts of flotation, Winer formulated an opinion that the barge had reached a state of equilibrium before loading, and even though the barge's draft was deepening slowly each day it was not in danger of sinking at Newport News (Tr. 249–50). Winer's actual report was never put into evidence to support his testimony for the reason that at trial he altered his calculation of the figure for stow (cargo) permeability from 10% to 5%. Nonetheless, Winer's testimony introduces the

7. Joseph Winer is a licensed professional engineer in New York and New Jersey, and is a member of several prominent naval architecture and mechanical and marine engineering societies.

8. Stauffer is a consultant specializing in the bakery-cereal chemistry-related foods area with a Ph.D degree from University of Minnesota in the field of biochemistry. He conducted basic research for Proctor & Gamble Co. for 13 years, in a variety of areas, some major ones being: emulsifier systems for cake mixes, enzymes for detergent uses, and immuno-assay reactions in a number of systems. Stauffer also worked for 5 years as head of Research and Development Technology Services for the Bakery Division of Kroger Co. During the last six years, Stauffer has worked with a wide variety of food industry firms throughout the United States and internationally.

real possibility that once the barge flooded it attained a state of equilibrium relatively quickly, so that the disposition of the barge remained level while the subsequently perceptible increase in the depth of its draft was relatively minimal during the mooring period at the fleeting area and at pier 15 (Tr. 257). In point of fact, Winer's findings are buttressed by an evidentiary void in the record regarding the existence of *any* report warning that the draft of BARGE WA 1-0170 was observed at a suspiciously deep level prior to loading.

Dr. Clyde Stauffer conducted a laboratory experiment regarding the permeability rate of water into flour, and regarding the point in time that fermentation would occur due to exposure of flour to water. Essentially Stauffer's experiment consisted of immersing portions of flour each wrapped in cotton cloth bags to three-quarters depth in ordinary tap water with a temperature of 58 degrees. Stauffer removed one of the packages at three hours, and then at intervals of one day for a period of five days to measure the thickness of the wet layer. His experiment revealed that the rate of penetration of water into the flour increased by $\frac{1}{16}''$ per day. Stauffer explained that since the flour in the barge was packaged in plastic bags and was wrapped in polyethylene wrapping the permeability rate would be even slower within BARGE WA 1-0170.

Respecting the actual depth of water penetration to the flour in BARGE WA 1-0170, the only evidence submitted is a survey conducted by Lee McAndrews, Inc. ("McAndrews") which established that by April 28, 1988 (the sound bags having been removed on April 12), the flour located within the top tier of the remaining partially wetted bags had crusted to a depth of 1″-2″ and the bags below the 5′ of free water left in the barge were "completely waterlogged" (deft's exh. CC). According to Stauffer, the McAndrews findings merely evidenced that the cargo had been wetted for a minimum of nineteen days but were of no assistance in determining the maximum period that the bags may have been in a wetted state.

The second portion of Stauffer's experiment consisted of physically smelling the contents in the cotton bags at various intervals for the purpose of detecting the point in time at which the presence of an odor associated with the process of fermentation would manifest itself. Stauffer described the process of fermentation as the metabolic action of micro-organisms, yeast and/or bacteria, converting sugar into energy for their use and growth. He added that fermentation occurs in an anaerobic atmosphere (lacking oxygen) and emits three byproducts: energy, carbon dioxide and ethanol. The presence of ethanol accounts for the odor associated with the process of fermentation. Continuing, Stauffer testified that the fermentation process is slowed by the combination of a drop in the temperature level and a decrease in the amount of bacterial micro-organisms present in the mixture. Stauffer stated that during his experiment he detected the presence of ethanol odor on the third day, and indicated that the odor's relative potency increased on the fourth day. On the fifth day of the experiment, mold began to grow on top of the wetted bags and a moldy or musty odor overshadowed any ethanol odor (Tr. 203). However, since the surface of the bags within BARGE WA 1-0170 were comprised of polyethylene instead of cotton, Stauffer found that the presence of mold buildup would be slowed because polyethylene does not present as good a substrate for the mold to begin growth (Tr. 204). Thus, the ethanol odor could possibly be detected for longer periods.

Stauffer concluded that the relative strength of the ethanol odor is an excellent indicator of the period of time the fermenting substance has been in a wetted state. Accordingly, the heavy smell of fermentation reported in the Seaspan report (pltf's exh. 5) indicated to Stauffer that the flour in BARGE WA 1-0170 had been wetted for at least one entire day, and possibly as long as five to seven days depending upon the temperature conditions inside the barge and the relative load of micro-organisms present within the barge. Stauffer, however, estimated that the flour was wetted

for a minimum of five days, based on his opinion that the temperature within the barge was approximately equal to the temperature of the water utilized during his experiment (58 degrees), and based on his estimate that the native population of micro-organisms was relatively low under such temperature conditions within the barge. Stauffer estimated the barge temperature, predicated on the principal of thermal transfer between the floating barge and the surrounding water which temperature he estimated by reference to the average air temperature of the Newport News area during March and early April of 1988: 49.5 degrees F. for March and 58.5 degrees F. for April (pltf's exh. 37).

Waterman, however, points up that BARGE WA 1–0170 was out of the water and on S/S STONEWALL JACKSON for approximately two days before it was opened in New York, and that during this period onboard the barge was subjected to much warmer temperature conditions and poorer ventilation which factors enhance the potency of the odor associated with the fermentation process. Waterman also contends that Stauffer's reliance on the thermal transfer between the barge and the water predicated on the average air temperature at Newport news is flawed since the air temperature in fact was much more varied from day to day (pltf's exh. 37). Therefore, argues Waterman, Stauffer's findings are based upon speculation, and Waterman maintains that the cargo was wetted for only a matter of hours prior to the discovery of the barge puncture.

Withal, Waterman's conclusion is purely speculative. Assuming *arguendo* that Hamlin's expert proof in fact approximates the amount of time required to flood the barge, and Stauffer's most conservative one-day estimate is utilized concerning the amount of time the bags were in a wetted state prior to discovery, the court finds that the net effect in Waterman's favor is merely a possible increase in the likelihood that the barge was not holed in the fleeting

area. But Hamlin's expert testimony does not advance Waterman's theory, namely that LADY JANICE was towing BARGE WA 1–0170 from pier 15 to the anchorage area when an error in navigation caused the puncture and water damage resulting in the total loss of 6,606 bags of wheat flour carried on board.

(2)

The central issue in this matter is whether or not the carrier, Waterman, successfully refuted the *prima facie* imputation to it of fault in failing under § 3(2) to "properly and carefully carry, keep, care for, and discharge the goods carried" 46 U.S.C.App. § 1303(2). Contending that Waterman did not, Royal concedes that the damage may have occurred when BARGE WA 1–0170 was temporarily moored at pier 15 between April 9th and 10th, but insists that Waterman still remains liable for exposing the cargo to the risk of damage by mooring the barge alongside an unsafe pier. Such action, insists Royal, fails to meet Waterman's COGSA obligation to keep and care for the cargo.

As previously mentioned, photographs taken of pier 15 clearly depict that a portion of the whaling is missing (and that spot, jagged) leaving an unprotected edge consisting of the remaining portion (Tr. 29–30; deft's exh. L). Indeed, as we have seen, Pryor frankly conceded that this particular spot was not safe for placing a barge alongside the pier (Tr. 155). Furthermore, Conn testified that during periods where the range of tide is at its high point the whaling becomes submerged and thus is nearly invisible (Tr. 34). At Newport News on April 9, high tide occurred at 0214 hours and 1442 hours; on April 10, high tide occurred at 0324 hours and 1556 hours (deft's exh. R [9]).

The record abundantly establishes that this portion of the pier was an unsafe spot to moor BARGE WA 1–0170. The central issue, then, is whether Waterman, which allegedly towed BARGE WA 1–0170 and

---

**9.** Defendant's Exhibit R actually indicated the USCG Tide Table for Hampton Roads, Virginia at Sewell's Point, but according to Conn, assuming a correction factor of +20 minutes one could calculate the high and low tide marks for Newport News (Tr. 27). Accordingly, the above figures have been adjusted to reflect this difference.

damaged its cargo at this demonstrably unsafe section of the pier, committed an error in the navigation of the barge thus excusing Waterman's carrier liability under COGSA.

For purposes of COGSA liability, an error in navigation of the barge was unlikely when BARGE WA 1–0170 was towed by the LADY JANICE from the fleeting area to pier 15 at 1915 hours on April 9, 1988 arriving at 1950 hours (deft's exh. H). Simply put, the unprotected edge of the whaling should have been plainly visible to the crew at this point in time since the unrebutted evidence establishes that the weather was clear (pltf's exh. 37) and that the tide was very near its low point (deft's exh. R).

Waterman, however, contends that the holing occurred on April 10, purportedly when the tug boat LADY JANICE was retrieving the barge from pier 15 for delivery to S/S STONEWALL JACKSON, and argues that the tide was near its high point when the incident transpired. But the court finds that Waterman utterly failed to sustain its COGSA burden of proving that BARGE WA 1–0170 was actually being navigated from pier 15 to the anchorage area when the puncture occurred with the resulting flooding, and that the captain or crew committed an error during navigation of the barge.

First, the court finds no merit in Waterman's bald allegation that the tide was near its high point and the whaling was submerged at the time of the incident. This contention directly conflicts with Waterman's clear lack of certainty respecting when BARGE WA 1–0170 may have been engaged in navigation. Indeed, in various portions of its brief Waterman inconsistently suggests that the barge was towed from the pier at 1230 hours on April 10, (deft's post-trial brief 9); alternatively, that it was towed sometime between 1230 and 1415 hours on April 10 (*Id.*, 10); or finally, that the barge was towed sometime during the afternoon of that date (*Id.*, 3).

Undoubtedly, the barge was towed at *some* point on April 10. However, Eastern Shore's tug boat log for LADY JANICE on

April 10 (deft's exh. H), definitively contradicts Waterman's contention that LADY JANICE was navigating BARGE WA 1–0170 during one of the above hypothesized time periods.

Second, Waterman failed to present the necessary evidence respecting which tug boat, if any, may have been navigating the barge at the time of the holing, or for that matter whether or not BARGE WA 1–0170 was actually being navigated at all when it was holed. It bears reiteration that under the COGSA defense of error in navigation the burden lies with the carrier, Waterman, to provide the requisite affirmative credible evidence documenting that BARGE WA 1–0170 was being navigated at the time of the holing and that the hole was due to an error in navigation. *Agrico Chem. Co.,* 459 F.Supp. at 645.

The court has carefully reviewed the record and based on all the facts and circumstances, the court determines that Waterman did not exercise due diligence in keeping and caring for the cargo when it admittedly exposed BARGE WA 1–0170 to the unsafe portion of pier 15. Furthermore, Waterman has wholly failed to sustain its burden of proving that an error committed during the course of navigation of BARGE WA 1–0170 resulting in the damage to its cargo of bagged wheat flour. The short of the matter: there is no precise knowledge concerning the reason for the barge's holing; Waterman has expounded several theories in its defense, but simply put Waterman has not carried its COGSA defense.

## CONCLUSION

Royal sustained its burden of making a *prima facie* showing of Waterman's liability for damage to 6,606 bags of wheat flour. Although Waterman was able to establish that BARGE WA 1–1070 was seaworthy at the inception of the voyage, Waterman breached its carrier's duty to exercise due diligence in keeping and caring for the cargo entrusted in its custody as required under 46 U.S.C.App. § 1303(2). Furthermore, Waterman could not show any error in the navigation or management of

BARGE WA 1–0170, and thus compels the conclusion that Waterman failed to affirmatively prove that it is excepted from liability as provided by 46 U.S.C.App. § 1304(2)(a).

Accordingly, the court holds that Waterman failed to exonerate itself from liability by bringing the cause of damage under the foregoing exemption clause, and Waterman is responsible for the damages suffered by Royal as subrogee to WFP, owner of the damaged cargo.

■■■ The parties agree that the value of the 6,606 damaged bags of wheat flour is $111,989.54. Royal further seeks prejudgment interest from April 11, 1988, the date after the discovery of the damage. Absent exceptional circumstances, prejudgment interest is customarily granted in admiralty cases. *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 310–11 (2d Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988). The district court has broad discretion in setting the rate of interest and the date of its commencement. *Independent Bulk Transp., Inc. v. Vessel "MORANIA ABACO"*, 676 F.2d 23, 26 (2d Cir.1982); *Standard Marine Towing Servs., Inc. v. M.T. Dua Mar*, 708 F.Supp. 562, 569 (S.D.N.Y. 1989).

Consequently, the court finds that prejudgment and post-judgment interest shall accrue at the rate set conforming to the formula prescribed in 28 U.S.C. § 1961(a) (1988). Pre-judgment interest shall commence to run on the sum of $111,989.54 from April 11, 1988, the date after the damage to BARGE WA 1–0170 was discovered.

The clerk shall enter judgment in favor of plaintiff for the sum of $111,989.54, together with interest as discussed *supra*, and with costs.